THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.
REFERENCE CIVLR 5.4 7.1(a)(1), 7.1(b)(1)
(Rule Number/Section)

IN THE UNITES STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONIA

IN RE

RICHARD LARRY SELF          3:13-cv-08199-PHX-DGC
                            3:13-cr-08036-DGC-1

---

Mr. Self would like to petition this court to grant CIVIL COMMETMENT FOR THE FOLLOWING SEVERAL REASONS.

(1) There seems to be no reasonable jurist in the legal system, every time Mr. Self petitions the several courts the answer is "DENIED, NO REASONABLE JURIST WOULD SEE ANYTHING WRONG WITH THE DECISION OF THE COURT". The Fourth Amendment is very plain in the wording of the particularity requirement, as well as the holdings of the Supreme Court, and the Ninth Circuit.

It is palin to see in the Fourth Amendment, the holdings of the Ninth Circuit in Ramirez V. Butte Silver-Bow County, United States V. Wong,. The Supreme Court holdings in Groh V. Ramirez, and Massachusettes V. Sheppard, that the particulartity requirement is to be with in the four corners of the warrant, not in some other document that was presented to the judge issuing the warrant. This Court and six judges from the Ninth Circuit decided to rule against the Constitution and the holdings for the Court.

(2) If this court would have allowed Mr. Self a competent Attorney instead of a friend and ex-coworker of the court, which proved to get Mr. Self convicted. If she would have communicated with the defendant with Mr. Self, or even listened to Mr. Self, things would have more than likely turned out differnt, and the matter of the particularity requirment would have been challenged before pretrial, instead of the staleness of the evidence she knew was not going any where. She would have collected all the Brady evidence from the government, and filed the 3600 motion for DNA forensic testing, ( Mr. Self filed a 3600 motion just after the denial of his 2255, and has never heard anything of it.). She refused to call witnesses, She refused to show

that the forensic testing of the hard drive from Mr. Selfs Computer, showed some one else was looking for child porn on it. She refused to challenge the time line provided by the government, and show that at the time said down load was made, Mr. Self was driving and there was two other people on the truck at the time. She failed to give Mr. Self any kind of defence.

(3) Mr. Self is now homeless, because of these decisions. He has lost every thing, vehicles, Home, Motorcycles, and thirty-five (35) years of keep sakes of a loved wife. but most of all his family, all because of the lack of a competent Attorney. She was so competent that they tried to interview a potential witness over the phone, while they kept loosing signal. Just how competent is that?

Mr. Self has no plans on a life time of registration for something he did not do, nor does he have plans for someone to be looking over his every move, with life time supervision. The registration alone would put himself and his family in danger, with his address and information out there for any one to read. This has been a problem all over the country.

(4) Mr. Self has had most every motion construed to something it was not. His resent 52(b) motion (plain error) was construed as a motion for a COA, and denied. they sent papers for a second and successive 2255. When Mr. Self Respectfully reminded the court that this a Plain Error motion, they again constued it as a reconsideration motion and again denied it.

Over the years of trying to get justice. Mr. Self has come to the conclusion that there is no such thing, with out a competent Attorny at least. Judges has total immunity, and life time tenure, I repectfully ask how a person can get justice when a judge can not be held accountable for their actions, even declaring war against the very constitution they took a oath to honor and protect.

Mr. Self wrote a Writ of Corum Nobis and this court sent it back saying

[2]

they could not hear it, that it was to be used after release from custody. but yet in they case of United States V. Roe, the Ninth Circuit instructed the District Court in Montana to hear it, and the Court have been given the authority to hear Writs under the All Wits Act.

It seems strange that a Court will resight the holdings of the Ninth Circuit when it pleases them and to rule against when it pleases them. Even the Ninth Circuit does this even though their holding state one panel will not over rule amother panel ruling except in en banc, and that District Courts are bound by their holding.

In conclusion under the present conditions, that Mr. Self will not register for something he did not do, and perhaps bring harm to his family. He will not submitt to a life time of some idiot probation officer looking over his shoulder, and not being able to move as he pleases in his retirement years, that this Court would at least give hime justice in his CIVIL COMMETMENT. His being homeless will prevent him from getting social security because of the lack of an address, which will also prevent him from getting a bank account

SUBMITTED THIS _____ DAY OF _____, 2020

_____
RICHARD LARRY SELF
Reg. No. 30099-008
FCI ENGLEWOOD
9595 West QUINCY AVE.
LITTLETON, CO 80123

# The Mirage of Justice

*by Chris Hedges, Truthdig*

IF YOU ARE POOR, YOU WILL ALMOST NEVER go to trial – instead you will be forced to accept a plea deal offered by government prosecutors. If you are poor, the word of the police, who are not averse to fabricating or tampering with evidence, manipulating witnesses and planting guns or drugs, will be accepted in a courtroom as if it was the word of God. If you are poor, and especially if you are of color, almost anyone who can verify your innocence will have a police record of some kind and thereby will be invalidated as a witness. If you are poor, you will be railroaded in an assembly-line production, from a town or city where there are no jobs, through the police stations, county jails and courts directly into prison. And if you are poor, because you don't have money for adequate legal defense, you will serve sentences that are decades longer than those for equivalent crimes anywhere else in the industrialized world.

If you are a poor person of color in America you understand this with a visceral fear. You have no chance. Being poor has become a crime. And this makes mass incarceration the most pressing civil rights issue of our era.

The 10-part online documentary "Making a Murderer," by writer-directors Moira Demos and Laura Ricciardi, chronicles the endemic corruption of the judicial system. The film focuses on the case of Steven Avery and his nephew, Brendan Dassey, who were given life sentences for murder without any tangible evidence linking them to the crime. As admirable as the documentary was, however, it focused on a case where the main defendant, Avery, had competent defense. He was also white. The blatant corruption of, and probable conspiracy by, the Manitowoc County Sheriff's Office in Wisconsin and then-Calumet County District Attorney Ken Kratz is nothing compared with what goes on in the well-oiled and deeply cynical system in place in inner-city courts. The accused in poor urban centers are lined up daily like sheep in a chute and shipped to prison with a startling alacrity. The attempts by those who put Avery and Dassey behind bars to vilify them further after the release of the film misses the point: The two men, like most of the rest of the poor behind bars in the United States, did not receive a fair trial. Whether they did or did not murder Teresa Halbach – and the film makes a strong case that they did not – is a moot point.

Once you are charged in America, whether you did the crime or not, you are almost always found guilty. Because of this, as many activists have discovered, the courts already are being used as a fundamental weapon of repression, and this abuse will explode in size should there be widespread unrest and dissent. Our civil liberties have been transformed into privileges – what Matt Taibbi in "The Divide: American Injustice in the Age of the Wealth Gap" calls "conditional rights and conditional citizenship" – that are, especially in poor communities, routinely revoked. Once rights become privileges, none of us are safe.

In any totalitarian society, including an American society ruled by its own species of inverted totalitarianism, the state invests tremendous amounts of energy into making the judicial system appear as if it functions impartially. And the harsher the totalitarian system becomes, the more effort it puts into disclaiming its identity. The Nazis, as did the Soviet Union under Stalin, broke the accused down in grueling and psychologically crippling interrogations – much the same way the hapless and confused Dassey is manipulated and lied to by interrogators in the film – to make them sign false confessions. Totalitarian states need the facade of justice to keep the public passive.

The *Guardian* newspaper reported: "The Innocence Project has kept detailed records on the 337 cases across the [United States] where prisoners have been exonerated as a result of DNA testing since 1989. The group's researchers found that false confessions were made in 28 percent of all the DNA-related exonerations, a striking proportion in itself. But when you look only at homicide convictions – by definition the most serious cases – false confessions are the leading cause of miscarriages of justice, accounting for a full 63% of the 113 exonerations."

"[T]he interrogator-butcher isn't interested in logic," Aleksandr Solzhenitsyn writes in *The Gulag Archipelago*, "he just wants to catch two or three phrases. He knows what he wants. And as for us – we are totally unprepared for anything. From childhood on we are educated and trained – for our own profession; for our civil duties; for military service; to take care of our bodily needs; to behave well; even to appreciate beauty (well, this last not really all that much!). But neither our education, nor our upbringing, nor our experience prepares us in the slightest for the greatest trial of our lives: being arrested for nothing and interrogated about nothing."

If the illusion of justice is shattered, the credibility and viability of the state are jeopardized. The spectacle of court, its solemnity and stately courthouses, its legal rituals and language, is part of the theater. The press, as was seen in the film, serves as an echo machine for the state, condemning the accused before he or she begins trial. Television shows and movies about crime investigators and the hunt for killers and terrorists feed the fictitious narrative. The reality is that almost no one who is imprisoned in America has gotten a trial. There is rarely an impartial investigation. A staggering 97 percent of all federal cases and 95 percent of all state felony cases are resolved through plea bargaining. Of the 2.2 million people we have incarcerated at the moment – 25 percent of the world's prison population – 2 million never had a trial. And significant percentages of them are innocent.

Judge Jed S. Rakoff, in an article in *The New York Review of Books* titled "Why Innocent People Plead Guilty," explains how this secretive plea system works to thwart justice. Close to 40 percent of those eventually exonerated of their crimes originally pleaded guilty, usually in an effort to reduce charges that would have resulted in much longer prison sentences if the cases had gone to trial. The students I teach in prison who have the longest sentences are usually the ones who demanded a trial. Many of them went to trial because they did not commit the crime. But if you go to trial you cannot bargain away any of the charges against you in exchange for a shorter sentence. The public defender – who spends no more than a few minutes reviewing the case and has neither the time nor the inclination

to do the work required by a trial – uses the prospect of the harshest sentence possible to frighten the client into taking a plea deal. And, as depicted in "Making a Murderer," prosecutors and defense attorneys often work as a tag team to force the accused to plead guilty. If all of the accused went to trial, the judicial system, which is designed around plea agreements, would collapse. And this is why trial sentences are horrific. It is why public attorneys routinely urge their clients to accept a plea arrangement. Trials are a flashing red light to the accused: DO NOT DO THIS. It is the inversion of justice.

The wrongly accused and their families, as long as the fiction of justice is maintained, vainly seek redress. They file appeal after appeal. Those convicted devote hundreds of hours of study in the law library in prison. They believe there has been a "mistake." They think that if they are patient the "mistake" will be rectified. Playing upon such gullibility, authorities allowed prisoners in Stalin's gulags to write petitions twice a month to officials to proclaim their innocence or decry mistreatment. Those who do not understand the American system, who are not mentally prepared for its cruelty and violence, are largely helpless before authorities intoxicated with the godlike power to destroy lives. These authorities advance themselves or their agendas – Joe Biden when he was in the Senate and Bill Clinton when he was president did this – by being "tough" concerning law and order and national security. Those who administer the legal system wield power largely in secret. They are accountable to no one. Every once in a while – this happened even under the Nazis and Stalin – someone will be exonerated to maintain the fiction that the state is capable of rectifying its "mistakes." But the longer the system remains in place, the longer the legal process is shrouded from public view, the more the crime by the state accelerates.

The power elites – our corporate rulers and the security and surveillance apparatus – rewrite laws to make their criminal behavior "legal." It is a two-tiered system. One set of laws for us. Another set of laws for them. Wall Street's fraud and looting of the U.S. Treasury, the obliteration of our privacy, the ability of the government to assassinate U.S. citizens, the revoking of habeas corpus, the neutralizing of our Fourth Amendment right against unreasonable searches and seizures, the murder of unarmed people in the streets of our cities by militarized police, the use of torture, the criminalizing of dissent, the collapse of our court system, the waging of pre-emptive war are rendered "legal." Politicians, legislators, lawyers and law enforcement officials, who understand that leniency and justice are damaging to their careers, and whom Karl Marx called the "leeches on the capitalist structure," have constructed for their corporate masters our system of inverted totalitarianism. They serve this system. They seek to advance within it. They do not blink at the victims destroyed by it. And most of them know it is a sham.

"We have to condemn publicly the very idea that some people have the right to repress others," Solzhenitsyn warned. "In keeping silent about evil, in burying it so deep within us that no sign of it appears on the surface, we are implanting it, and it will rise up a thousandfold in the future. When we neither punish nor reproach evildoers, we are not simply protecting their trivial old age, we are thereby ripping the foundations of justice from beneath new generations."

*This article was originally published by Truthdig (www.truthdig.com) on January 17, 2016; it is reprinted with the author's permission, with minor edits.*

# Criminal Defendants Shortchanged by Justice System that Favors Prosecutors

*by Derek Gilna*

Since the landmark Supreme Court case of *Gideon v. Wainwright* in 1963, criminal defendants who face incarceration have been guaranteed representation by an attorney if they cannot afford one. *Gideon* spurred most states and the federal government to form public defenders' offices, which have since been overwhelmed due to limited resources and a significant increase in prosecutions.

The prison population in the United States was 217,000 in 1963; it now stands at approximately 2.3 million. Unfortunately, resources devoted to representation for indigent defendants have not kept pace with the runaway increase in the number of prisoners. In 1973, the National Advisory Council on Criminal Justice Standards and Goals (NAC) established recommended caseload maximums for public defenders; decades later, average caseloads are often much higher.

*Prison Legal News* has previously reported on the disparity in results in cases handled by public defenders versus court-appointed attorneys and private attorneys; the better results for private attorneys can be directly attributed to the additional time they are able to devote to their clients. [See: *PLN*, Jan. 2011, p.18].

As a result, said John Gross of the National Association of Criminal Defense Lawyers, "Many of us don't consider [the caseload standards] to be realistic if you expect quality representation."

Recent studies have found that public defenders would need to work 50% more hours to accommodate an average caseload. According to the NAC recommendations, an attorney should handle no more than 400 misdemeanors, 150 felonies *or* 200 juvenile cases annually, though public defenders typically exceed those maximums.

Based on 2007 data, around 73% of county public defenders surpassed the maximum recommended NAC caseloads, according to the U.S. Department of Justice (DOJ). And according to 2009 data, the average caseload for public defenders in Florida was 500 felony cases and 2,225 misdemeanor cases.

It is no wonder that many public defense attorneys feel that time constraints reduce their ability to represent their clients to "meet 'em and plead 'em." Although funding for federal public defenders is higher than that budgeted on the state level, federal courts are also inundated by cases – particularly immigration cases involving illegal entry or reentry into the U.S.

Additionally, more than half of county-based public defenders' offices did not have caseload limits and could not refuse to represent indigent defendants, according to an October 2010 report by the Bureau of Justice Statistics.

The DOJ has warned that "caseload limits alone cannot keep public defenders from being overworked into ineffectiveness; two additional protections are required. First, a public defender must have the authority to decline appointments over the caseload limit. Second, caseload limits are no replacement of a careful analysis of a public defender's workload, a concept that takes into account all of the factors affecting a public defender's ability to adequately represent clients, such as the complexity of cases on a defender's docket, the defender's skill and experience, the support services available to the defender, and the defender's other duties."

Many courts have insufficient public defenders to handle all cases, and some defendants are therefore denied their constitutional right to counsel. In other jurisdictions staff shortages and insufficient funding result in huge backlogs. Such delays not only violate defendants' right to due process, but also result in an added burden to taxpayers due to increased jail costs to incarcerate defendants too poor to post bail. Defendants sometimes remain in jail for years awaiting trial.

In a January 2015 commentary, The Marshall Project urged the U.S. Attorney General to include prosecutors and judges in discussions over indigent defense. Public defenders are all too aware of the crisis, but others involved in the criminal justice system need to be better informed and engaged in order to address the issue.

Federal judge Alex Kozinski on the Ninth Circuit Court of Appeals appeared to have heard The Marshall Project's call for reform. On July 24, 2015, he published a paper criticizing, among other things, the favoritism towards prosecutors within the justice system as well as the inflated perception of witness credibility and evidence validity in criminal cases.

A study conducted by the ACLU estimated that public defenders in New Orleans spend an average of 7 minutes per client, and in Detroit and Atlanta the average times are 32 minutes and 59 minutes, respectively. In July 2015, the ACLU of Northern California filed a lawsuit against state officials and Fresno County challenging the indigent defense system where 60 public defenders handle around 42,000 cases a year. See: *Phillips v. State of California*, Fresno County Superior Court (CA), Case No. 15CECG0220.

"What is happening in Fresno is significant," said Jonathan Rapping, an attorney who founded Gideon's Promise – an organization that provides support and training for public defenders. "These lawsuits force state systems to examine what they are doing."

Notably, the amount of money spent on indigent defense, including public defenders' offices, is dwarfed by budgets for prosecutors and law enforcement on both the state and federal levels. Although expenditures for indigent defense have increased only slightly, funding for police and corrections has increased ten-fold and six-fold, respectively, from 1986 to 2008.

On the state level there is a wide disparity in per capita expenditures on indigent defense, ranging from an average $4.29 per capita in Mississippi to $42 in Alaska. The U.S. currently spends less on indigent defense than every European nation on a per capita basis. Clearly, if our criminal justice system is to fulfill the promise of the *Gideon* decision, more resources must be devoted to public defenders' offices to balance the rights of defendants to adequate representation against the power wielded by prosecutors.

Sources: *www.motherjones.com, www.themarshallproject.org, www.reason.com, http://sixthamendment.org, www.acslaw.org, www.northwestern.edu*

The following is an interesting article we found which was authored by Law Professor Douglas A. Berman from the Moritz College of Law at The Ohio State University. It is entitled, "Why Police Lie Under Oath and deeper challenges involving criminal justice metrics". It was published on February 3, 2013 and can be found at the following internet site: http://sentencing.typepad.com/sentencing_law_and_policy/2013/02/why-police-lie-under-oath-and-deeper-challenges-involving-criminal-justice-metrics.html

While the study does not surprise us and while we have always taken the veracity of prosecution witnesses with a grain of salt, we thought that you and other inmates might be interested.

Article:

Thousands of people plead guilty to crimes every year in the United States because they know that the odds of a jury's believing their word over a police officer's are slim to none. As a juror, whom are you likely to believe: the alleged criminal in an orange jumpsuit or two well-groomed police officers in uniforms who just swore to God they're telling the truth, the whole truth and nothing but? As one of my colleagues recently put it, "Everyone knows you have to be crazy to accuse the police of lying."

But are police officers necessarily more trustworthy than alleged criminals? I think not. Not just because the police have a special inclination toward confabulation, but because, disturbingly, they have an incentive to lie. In this era of mass incarceration, the police shouldn't be trusted any more than any other witness, perhaps less so.

That may sound harsh, but numerous law enforcement officials have put the matter more bluntly. Peter Keane, a former San Francisco Police commissioner, wrote an article in The San Francisco Chronicle decrying a police culture that treats lying as the norm: "Police officer perjury in court to justify illegal dope searches is commonplace. One of the dirty little not-so-secret secrets of the criminal justice system is undercover narcotics officers intentionally lying under oath. It is a perversion of the American justice system that strikes directly at the rule of law. Yet it is the routine way of doing business in courtrooms everywhere in America."

Though focused on police practices, this piece goes on to touch upon the broader systemic problems that can result from "get tough" metrics (much too?) often being used by police and prosecutors and rewarded by legislatures:

"Police departments have been rewarded in recent years for the sheer numbers of stops, searches and arrests. In the war on drugs, federal grant programs like the Edward Byrne Memorial Justice Assistance Grant Program have encouraged state and local law enforcement agencies to boost drug arrests in order to compete for millions of dollars in funding. Agencies receive cash rewards for arresting high numbers of people for drug offenses, no matter how minor the offenses or how weak the evidence. Law enforcement has increasingly become a numbers game. And as it has, police officers' tendency to regard procedural rules as optional and to lie and distort the facts has grown as well. Numerous scandals involving police officers lying or planting drugs in Tulia, Tex. and Oakland, Calif., for example have been linked to federally funded drug task forces eager to keep the cash rolling in....

"The natural tendency to lie makes quota systems and financial incentives that reward the police for the sheer numbers of people stopped, frisked or arrested especially dangerous. One lie can destroy a life, resulting in the loss of employment, a prison term and relegation to permanent second-class status. The fact that our legal system has become so tolerant of police lying indicates how corrupted our criminal justice system has become by declarations of war, "get tough" mantras, and a seemingly insatiable appetite for locking up and locking out the poorest and darkest among us.

See: http://sentencing.typepad.com/sentencing_law_and_policy/2013/02/why-police-lie-under-oath-and-deeper-challenges-

⇔30099-008⇔
Richard Self
Federal Correctional Institution
Englewood 9595 W Quincy
Littleton, CO 80123
United States

DENVER CO 800
RECEIVED
APR 0 6 2020
CLERK OF THE COURT
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

LEGAL MAIL

⇔30099-008⇔
Us Dist Court Clerk
401 W Washington ST. ROOM 130
US Courthouse Spc10
Phoenix, AZ 85003-2119
United States

85003-212430

LEGAL MAIL